## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **In the Matter of an Application to Enforce an Administrative Subpoena of the** | ) ) ) | |
| **U.S. COMMODITY FUTURES TRADING COMMISSION,** | ) ) ) | |
| **Applicant,** | ) ) | **Misc. Action No.** |
| **v.** | ) ) ) | |
| **AARON B. BUTLER,** | ) ) | |
| **Respondent.** | ) ) | |

## MEMORANDUM IN SUPPORT OF
## APPLICATION FOR AN ORDER TO SHOW CAUSE AND AN ORDER
## REQUIRING COMPLIANCE WITH ADMINISTRATIVE SUBPOENA

On March 27, 2018, Applicant U.S. Commodity Futures Trading Commission ("Commission" or "CFTC"), through its Division of Enforcement (the "Division") and pursuant to its statutory authority, issued a subpoena *duces tecum* and *ad testificandum* (the "Subpoena") to Respondent Aaron B. Butler, an individual residing in Muscle Shoals, Alabama.  The Subpoena was issued in connection with an ongoing investigation being conducted by the Division relating to certain persons engaged in fraud with respect to pooled investments and/or managed accounts of commodities.  As explained below in greater detail, the Division issued the Subpoena because, based upon individual complaints as well as other information received by the Commission, it appeared that Mr. Butler may have fraudulently solicited customers and potential customers located in the United States (1) to provide training on commodities trading and (2) to trade binary options in commodities, such as foreign exchange traded currencies ("forex"), through a commodity pool called Negus Capital Incorporated ("NCI") that was

managed by Mr. Butler.[1]  It also appeared based on certain bank records of Mr. Butler received

by the Division that Mr. Butler may have misappropriated customer funds relating to those

investments.[2]

Although Mr. Butler was personally served with the Subpoena on March 29, 2018, he,

without any justification, failed to comply with the Subpoena despite ample notice and warning

of a potential enforcement action being filed against him in a federal court.

Accordingly, because Mr. Butler has failed to comply in any way with the obligations

imposed by the Subpoena or communicate with the Division concerning the Subpoena, and,

since Mr. Butler has cited no reason for his non-compliance, the Commission's sole avenue for

redress is to seek an order from the Court requiring Mr. Butler to show cause why he should not

be compelled by the Court to comply fully with the Subpoena.  As explained in greater detail

below and in light of the facts, the Court clearly possesses subject matter jurisdiction for

subpoena enforcement, personal jurisdiction over Mr. Butler, and is the proper venue for this

action.  *See, Nat'l Labor Relations Bd. v. Cooper Tire & Rubber Co.*, 438 F.3d 1198 (D.C. Cir.

2006); *U.S. Int'l Trade Comm'n v. ASAT, Inc.*, 411 F.3d 245 (D.C. Cir. 2005); *Fed. Election

Comm'n v. Comm. to Elect Lyndon La Rouche*, 613 F.2d 849 (D.C. Cir. 1979); *Fed. Trade

---

[1]  A binary option is a financial option in which the payoff is either some fixed monetary amount or nothing at all. *See https://en.wikipedia.org/wiki/Binary_option* (last visited October 3, 2018). As explained by North American Derivatives Exchange ("Nadex"), a U.S.–based, retail–focused, online binary options exchange:  "A binary option asks a simple yes/no question: Will this market be above this price at this time?  You buy the option if you think yes and sell if you think the answer is no.  When the trade expires, if you're right, you get the full $100 value.  If you are wrong, you'll get zero." *See https://www.nadex.com/binary-options* (last visited October 3, 2018)*.*  Also, a Court in this District held that binary options on forex are financial instruments regulated by the Commission under the Act.  *See CFTC v. Trade Exchange Network Ltd.*, *et al.*, 117 F.Supp.3d 29, 35–38 (D.D.C. 2015); *see also CFTC v. Vision Financial Partners, et al.*, 190 F.Supp.3d 1126, 1130 (S.D. Fla. 2016).

[2]  The Division obtained these records relating to Mr. Butler directly from the financial institutions holding the records after first providing Mr. Butler the required notice in accordance with the Right to Financial Privacy Act of 1978, 12 U.S.C. §§ 3401-22 (2012).

*Comm'n v. Browning*, 435 F.2d 96 (D.C. Cir. 1970).  Further, the Subpoena is well within the Commission's authority, and the documents and information demanded by the Subpoena are sufficiently definite and seek reasonably relevant information.  Therefore, the Court should issue an order requiring Mr. Butler to show cause why he should not be compelled to comply fully with the Subpoena.  Should Mr. Butler not show good cause, the Commission respectfully requests that the Court issue a subsequent order: (1) requiring Mr. Butler to comply immediately in all respects with the Subpoena, including (a) that he produce all books, papers, documents and other tangible things specified in Schedule A to the Subpoena to the Commission that are in his possession, custody and/or control, and (b) that he personally appear before the Commission at its office in Washington, D.C., to provide testimony; and (2) providing any other relief the Court deems appropriate for Mr. Butler's failure to show good cause.

## FACTUAL BACKGROUND

The Commission is an independent federal regulatory agency responsible for administering and enforcing the Commodity Exchange Act, 7 U.S.C. §§ 1-26. (2012) (the "Act" or "CEA"), and Commission Regulations, 17 C.F.R. § 1.1-190.10 (2018) promulgated thereunder ("Regulations").

Aaron B. Butler is an individual who resides in Muscle Shoals, Alabama.  *See* Declaration of Commission Investigator Kevin Samuel in Support of Application for an Order to Show Cause and an Order Requiring Compliance with Administrative Subpoena ("Investigator Decl.") at ¶ 5, attached here at Exhibit ("Ex.") 1.  Mr. Butler is the sole director of NCI, an Alabama corporation that was formed in 2016 and has the same principal address as Mr. Butler. *Id*.  Mr. Butler and NCI are not and have not been registered with the Commission in any capacity.  *Id*.

The Commission's mission is "to foster open, transparent, competitive, and financially sound markets, to avoid systemic risk, and to protect the market users and their funds, consumers, and the public from fraud, manipulation, and abusive practices related to derivatives and other products that are subject to the Commodity Exchange Act."  COMMODITY FUTURES TRADING COMMISSION, *http://www.cftc.gov/About/MissionResponsibilities/index.htm* (last visited October 3, 2018).  The markets within the Commission's jurisdiction affect "a national public interest by providing a means for managing and assuming price risks, discovering prices, or disseminating pricing information through trading in liquid, fair and financially secure trading facilities."  7 U.S.C. § 5(a) (2012).  These markets—with the U.S. futures markets estimated at $30 trillion and the swaps markets at $400 trillion—are "large and economically significant," and "ensuring that these markets are transparent, open, and competitive is essential to their proper functioning and to help safeguard the financial stability of the Nation."  COMMODITY FUTURES TRADING COMMISSION STRATEGIC PLAN, FYs 2014-2018, at 5, *https://www.cftc.gov /sites/default/files/idc/groups/public/@aboutcftc/documents/file/2018strategicplan.pdf* (last visited October 3, 2018).

To achieve its mission, one of the Commission's strategic goals is "comprehensive enforcement," carried out by the Division.  *Id.* at 9, 25-29.  The Division seeks to achieve this goal in part by "employ[ing] various investigative plans, analytics, and tools until sufficient evidence is obtained to determine whether or not a violation occurred within the jurisdiction of the Commission."  *Id.* at 26.  Chief among the Division's tools are requests for information to registrants pursuant to 7 U.S.C. § 6g (2012), voluntary requests for information and interviews of potential witnesses, and the nationwide issuance of subpoenas for documents and compelled testimony pursuant to 7 U.S.C. § 9(5)-(6) (2012).  Investigator Decl. at ¶ 3.

4

In early 2018, the Commission received a number of complaints from individuals residing in, among other places, Georgia, Florida, Oklahoma, Louisiana and New York concerning Mr. Butler and NCI.  *Id*. at ¶ 7.  According to these complaints, Mr. Butler solicited individuals through social media companies, such as Facebook and Telegram, to provide training on trading forex and binary options for a fee.  In particular, Mr. Butler required individuals to pay $300 to Mr. Butler as an initiation fee for access to NCI's social media group and for forex training and mentorship.  *Id*.

Mr. Butler also solicited and obtained funds from individuals purportedly so that he could trade forex and binary options on their behalf and manage their accounts with NCI.  *Id*. at ¶ 8. Specifically, individuals interested in NCI's account management services were required to invest with Mr. Butler and NCI a minimum of $500.  *Id*.  Prospective customers were told that they could expect a payout after six months, at which time they could cash out or roll over their investment for another six-month period.  Those individuals who invested with Mr. Butler and NCI were not permitted to withdraw their funds until after the six-month period expired.  *Id*. at ¶ 9.  Once individuals decided to join the NCI group or invest funds for trading, they were instructed to send funds directly to Mr. Butler or to persons associated with Mr. Butler.  These individuals provided the funds using service providers such as PayPal, Zelle, Venmo, and Google Wallet.  Additionally, some individuals were instructed to wire funds to bank accounts in the name of Mr. Butler held at TD Bank, N.A. and First Southern Bank.  *Id*.  Mr. Butler informed these individuals that their funds would be pooled in a single account to be managed by Mr. Butler at Nadex.  Subsequently, Mr. Butler informed individuals that there were multiple pools based upon the level of funding.  *Id*.  Moreover, Mr. Butler represented to these individuals that NCI would match the amount of their principal investment so that their principal investment was

guaranteed.  *Id.*  Mr. Butler also informed these individuals that he could earn profits in the six-figure range and posted supposed account statements showing purported payouts of prior customers of Mr. Butler on NCI's Facebook page.  *Id.*  NCI's Facebook page purported to have more than 600 members.  *Id.*

Thereafter, according to the complaints, several individuals claimed that they were unable to make any withdrawals from their accounts with Mr. Butler and NCI.  *Id.* at ¶ 10. Indeed, at least two individuals contacted Nadex and learned that Nadex does not permit managed accounts like the one that Mr. Butler purportedly had opened.  Mr. Butler subsequently blocked on social media, including NCI's Facebook page, certain individuals seeking a refund of their investment and initiation fee and alleged that he was unable to make any refunds to those individuals because his accounts had been "frozen."  *Id.*

Accordingly, on behalf of the Commission, the Division initiated an investigation into Mr. Butler and NCI from its Washington, D.C. headquarters to discern whether Mr. Butler, NCI and/or other individuals associated with NCI had violated or were violating anti-fraud provisions of either the Act and/or Regulations.  *Id.* at ¶ 11.

Division staff have taken several steps in its investigation of Mr. Butler and NCI from the Commission's headquarters.  Specifically, Division staff in Washington have, among other things: received complaints and documents from investors of Mr. Butler and NCI; obtained authority to investigate pursuant to a formal order issued by the Commission; sent out correspondence, requested documents and issued subpoenas; received responses and documents in response to those requests; maintained investigative files; and conducted telephonic interviews with potential witnesses.  *Id.* at ¶ 12.

For example, Division staff have received complaints and documents in its headquarters from individuals who invested with Mr. Butler and NCI and who reside in, among other places, Georgia, Florida, Oklahoma, Louisiana and New York.  Investigator Decl. at ¶ 13.

Additionally, from its headquarters, Division staff have issued requests from Commission registrants, such as Nadex as well as future commission merchants, for documents relating to any trading accounts in the name of Mr. Butler and NCI.  *Id*. at ¶ 14.

Moreover, Division staff have issued subpoenas, which are returnable to Washington, to banks with pertinent information located in Alabama, Utah, and New Jersey.  *Id*. at ¶ 15.  The records produced by the banks evidence wires being sent to Mr. Butler's personal bank accounts from various investors located throughout the United States.  For instance, one investor in NCI wired monies from her savings account in Texas to an account at TD Bank in the name of Mr. Butler located in New York.[3]  *Id*.  Indeed, between Mr. Butler's accounts at TD Bank and First Southern, there were deposits in excess of $430,000.   Such deposits were made by various individuals across the United States, including but not limited to Alabama, South Carolina, and Florida, in amounts ranging from $250 to $25,000 over the period of September 2014 to March 2018.[4]  During the same time period, Division staff was only able to confirm deposits by Mr. Butler into trading venues of approximately $900.  And, the records show that Mr. Butler spent most of the monies that he received on travel, entertainment, personal items, and jewelry in venues located in Maryland, Virginia, Texas, Florida, Georgia, and Alabama.  *Id*.

---

[3]   Besides this wire transfer, the bank records reflect that over $150,000 was wired into this account by approximately 50 individuals.  *Id.* at n. 3.

[4]   The records also show that there were approximately ten instances in which individuals deposited monies equal to or in excess of $10,000 to one of Mr. Butler's bank accounts.  *Id.* at n. 4.

Further, as part of the investigation, from its headquarters in the District of Columbia, Division staff have interviewed investors located in Florida and New York. *Id.* at ¶ 16.

Based on the information that they had gathered, it was clear to Division staff that Mr. Butler possessed vital and direct information concerning the investigation. So, acting pursuant to a formal order of investigation issued by the Commission, the Division properly issued the Subpoena to Mr. Butler on March 27, 2018. *Id.* at ¶ 17 and Ex. A thereto.

The Subpoena required Mr. Butler to produce relevant documents from the period of January 1, 2013, through the present relating to not only himself and NCI but also other companies that appeared related to Mr. Butler[5] including: documents pertaining to trading accounts for binary options, forex, futures and options on futures relating to the Aaron Butler Companies; documents concerning bank accounts relating to Mr. Butler and the Aaron Butler Companies; documents concerning Mr. Butler's communications with customers and potential customers of the Aaron Butler Companies; documents concerning advertising and promotional materials for the Aaron Butler Companies; documents concerning websites for the Aaron Butler Companies; and documents concerning Mr. Butler's own investments and account relating to the entities at issue. *Id.* at ¶ 18 and Ex. A at p. 9–11 thereto.

The Subpoena established April 25, 2018, as the return date for Mr. Butler's production of responsive documents to the Subpoena. *Id.* at ¶ 19. The Subpoena also commanded Mr. Butler to appear to testify before officers of the Commission on June 6, 2018 at the Commission's headquarters in Washington, D.C. *Id.* A warning that "failure to comply with this subpoena may result in the commencement of a legal action in the United States District

---

[5] Based on interviews with customers of NCI, the Division discerned that Mr. Butler may have used these other companies in commodity pooling schemes similar to NCI (the "Aaron Butler Companies").

Court to compel compliance with the requirements hereof" appeared in bold face, capital letters type on the front of the Subpoena. *Id.* The Subpoena was personally served on Mr. Butler at his residence in Muscle Shoals, Alabama on March 29, 2018.[6] *Id.*

The deadline set for document production expired on April 25, 2018 with no production or communication from Mr. Butler. Investigator Decl. at ¶ 20. Mr. Butler did not appear at the Commission's headquarters on June 6, 2018 to provide testimony as required by the Subpoena. To date, the Division has not received any documents from Mr. Butler, has not taken any testimony from Mr. Butler and has not had any communications from Mr. Butler. *Id.*

## THE COURT HAS JURISDICTION AND VENUE OVER THIS APPLICATION

The Act, in broad terms, permits expansive service and enforcement of administrative subpoenas. Because investigations concerning commodity futures trading involve exchanges, banks, and persons located and operating throughout the United States and abroad, the Act grants the Commission nationwide and global authority to "administer oaths and affirmations, subpoena witnesses, compel their attendance, take evidence, and require the production of any books, papers, correspondence, memoranda, or other records that the Commission deems relevant or material to the inquiry." 7 U.S.C. § 9(5); *see also id.* § 9(6) ("The attendance of witnesses and the production of any such records may be required from any place in the United States, any State, or any foreign country or jurisdiction at any designated place of hearing."). The Commission's authority to enforce its subpoenas is equally expansive:

> In case of contumacy by, or refusal to obey a subpoena issued to, any person, *the Commission may invoke the aid of any court of the*

---

[6] Originally, the Division issued the Subpoena to Mr. Butler on March 13, 2018 and attempted to serve it on him by certified mail at his residence in Muscle Shoals, Alabama. Mr. Butler, however, did not claim the package containing the Subpoena and the postal service returned it to the Division. Accordingly, the Division re-issued the Subpoena and it was personally served on Mr. Butler. *Id.* at n. 6.

> *United States within the jurisdiction in which the investigation or proceeding is conducted*, or where such person resides or transacts business, in requiring the attendance and testimony of witnesses and the production of books, papers, correspondence, memoranda, and other records.  Such court may issue an order requiring such person to appear before the Commission or . . . other officer designated by the Commission, there to produce records, if so ordered, or to give testimony touching the matter under investigation or in question.

7 U.S.C. § 9(8) (emphasis added).

In light of the evidence of Mr. Butler's possible violations of the Act and Regulations, and that he clearly has relevant information concerning the Aaron Butler Companies, including NCI, 7 U.S.C. §§ 9(5) and (6) plainly authorize the Commission to serve the Subpoena upon Mr. Butler in Alabama.  As discussed further below, 7 U.S.C. § 9(8) "both establishes where venue and personal jurisdiction are proper and serves as a specific grant of subject matter jurisdiction." Memorandum and Order, *In re: U.S. Commodity Futures Trading Comm'n* v. *Sullivan,* No. 15-mc-00032, Dkt. No. 8, at 2 (D.D.C. April 3, 2015) (Moss, J.), a copy of which is attached at Ex. 2.  Thus, this provision, as interpreted by the cases cited below, provides this Court with the jurisdiction and venue necessary to enforce the Subpoena against Mr. Butler.

I.     THE COURT HAS SUBJECT MATTER JURISDICTION

A.     **Legal Background**

In a series of opinions, the D.C. Circuit has provided guidance for interpreting the clause "the jurisdiction in which the investigation or proceeding is conducted" found in 7 U.S.C. § 9(8). *See, e.g.*, *Fed. Election Comm'n v. Comm. to Elect Lyndon La Rouche*, 613 F.2d 849 (D.C. Cir. 1979); *U.S. Int'l Trade Comm'n v. ASAT, Inc.*, 411 F.3d 245 (D.C. Cir. 2005); and *Nat'l Labor*

*Relations Bd. v. Cooper Tire & Rubber Co.*, 438 F.3d 1198 (D.C. Cir. 2006).[7]

The court in *La Rouche* considered whether the District of Columbia District Court had subject matter jurisdiction to enforce a Federal Election Commission subpoenas issued in the course of an investigation into potential violations of federal election laws, seeking the production of documents from five organizations at their New York offices**.** *La Rouche*, 613 F.2d at 851-52.  Relying on an earlier court of appeals decision, *Fed. Trade Comm'n v. Browning*, 435 F.2d 96 (D.C. Cir. 1970), and various district court cases interpreting comparable provisions of the Federal Trade Commission Act, the *La Rouche* court set forth a two part inquiry, holding that in evaluating jurisdiction over a subpoena enforcement action, a court must consider: "(1) whether the District of Columbia bore a sufficiently 'reasonable relation to the subject matter of the investigation' to qualify as a place where the inquiry was carried on, and (2) whether the agency's choice of this jurisdiction as its place of inquiry exceeded 'the bound of reasonableness.'"  *Id.* at 856-57 (citation omitted); *see also ASAT*, 411 F.3d at 248 (citing the *La Rouche* test with approval); *Cooper Tire & Rubber Co.*, 438 F.3d at 1201 (same).  On its facts, the *La Rouche* court determined that "[t]he nexus between this jurisdiction and the Commission's investigation lies in the fact that the District of Columbia, where the Commission maintains its headquarters, was the hub of the Commission's investigative activity."  *La Rouche*, 613 F.2d at 857.

Building off of this decision, the court in *ASAT*—asked to enforce a subpoena issued in the course of an International Trade Commission patent infringement investigation—delineated a

---

[7]  These opinions are instructive in their interpretation of statutory language similar to that found in the Commodity Exchange Act.  *See Sullivan,* No. 15-mc-00032, Dkt. No. 8, at 2 n.1 (Moss, J.), at Ex. 2 ("Although the Court of Appeals' precedents regarding the proper location for enforcement of agency subpoenas involve different statutes, those statutes are similar to 7 U.S.C. § 9(8), and there is no reason why the logic of those decisions should not control here.").

number of factors relevant to the reasonable relationship to the subject matter of the investigation in satisfaction of the first prong of the *La Rouche* inquiry:

> Among the factors relevant to this determination are: the place where the Commission held its hearing, the place where it made the decision to authorize the investigation, the place where the subpoenas were issued, the place where its correspondence emanated, the place where the Commission determined that unlawful actions had occurred, the location of the documents and witnesses, and the location of the headquarters of the subpoenaed company.

*ASAT*, 411 F.3d at 249.  Weighing these factors, the court took note that although the subpoenaed company and documents were located in California, the "Commission's activities regarding the subpoena at issue were conducted overwhelmingly in the District of Columbia," and so the District of Columbia court had jurisdiction.  *Id.*  The court further noted that, as the respondent "demonstrated no actual hardship of defending itself in the District of Columbia," adjudicating subpoena enforcement there was "well-within the bound of reasonableness."  *Id.* at 250.

Finally, *Cooper Tire* involved a National Labor Relations Board ("NLRB") investigation into whether activities at a Tupelo, Mississippi manufacturing plant violated a prior Fifth Circuit cease-and-desist order in connection with union solicitation and activities.  *Cooper Tire*, 438 F.3d at 1198-99.  In evaluating whether it had jurisdiction to enforce a subpoena from the NLRB's District of Columbia branch, the court reiterated the *La Rouche* test and the *ASAT* factors, but also noted that the analysis must not flow from a "simplistic tallying of factors;" rather "[t]he crucial question remains whether the jurisdiction bears a 'reasonable relation to the subject matter of the investigation.'"  *Id.* at 1201 (*quoting La Rouche*, 613 F.2d at 857).

Importantly, the *Cooper Tire* court distinguished those precedents enforcing subpoenas in District of Columbia courts even where the subject matter of the investigation was located outside of the district as involving "nationwide" investigations:

> [E]very one of these cases involved an investigation that
> encompassed multiple jurisdictions and could be characterized as
> nationwide in scope. ***When an investigation is nationwide in
> scope, its subject matter is not located in any particular place,
> and the location of the investigating office may well be the most
> reasonable choice for purposes of subpoena enforcement.***

*Id.* at 1202 (emphasis added);[8] s*ee also* Order, *In re: U.S. Commodity Futures Trading Comm'n*

v. *Conley,* No. 16-mc-02158, Dkt. No. 9, at 4 (D.D.C. February 6, 2017) (Sullivan, J.), a copy of

which is attached at Ex. 3 ("when an agency is conducting a nationwide investigation and the

District of Columbia is the 'hub' of that investigation, a District Court in the District of

Columbia has subject matter jurisdiction and venue is proper in that court.")

### B.     The Commission Issued the Subpoena to Respondent Pursuant to a Nationwide Investigation with Its Hub at Its Headquarters in the District of Columbia

The Division is conducting a nationwide investigation into Mr. Butler and the Aaron

Butler Companies, including NCI, from the Commission's headquarters located in the District of

Columbia.  Investigator Decl. ¶ 11.  Thus, the District of Columbia necessarily bears "a

sufficiently reasonable relation to the subject matter of the investigation to qualify as a place

---

[8]   For example, the court explained that the subpoena in *La Rouche* flowed from an investigation into possible improprieties of a national political party in a national political campaign, involving donations from multiple states.  *Id.*  Even though many of the activities under investigation occurred in New York, it reasoned, the investigation was nationwide in scope, and so the District of Columbia had jurisdiction over subpoena enforcement as the hub of that investigation.  *Id.* at 1202-03.  By contrast, the court found that the investigation in *Cooper Tire* was not nationwide in scope as the "investigation concerns a single employer and a single dispute related to union-organizing activity at a single plant.  The subject matter of this inquiry *is* located in a particular place, and that place is Tupelo, Mississippi."  *Id.* at 1202.  Concluding that "the place of inquiry does not include the District of Columbia," the court ordered dismissal for lack of jurisdiction. *Id.* at 1204.  However, faced with criticism from the dissent that the court's focus on a nationwide investigation ran counter to the plain meaning of the statute and represented a departure from precedent, *id.* at 1204-08 (Griffith, J., dissenting), the court clarified the limits of its holding, stating that jurisdiction "do[es] not . . . always require[] a national investigation; enforcement in the District, as anywhere else, depends on an application of the factors listed in *La Rouche* and *ASAT*, and a national investigation merely works to tip the scale in favor of the District."  *Id.* at 1204.

where the inquiry [is] carried on," in satisfaction of the first *La Rouche* prong.  *La Rouche*, 613 F.2d at 856-57 (citations omitted).

Like in *ASAT*, "the Commission's activities" regarding the Subpoena at issue here "were conducted overwhelmingly in the District of Columbia."  *ASAT*, 411 F.3d at 249.  The attorneys and staff conducting the investigation into Mr. Butler and the Aaron Butler Companies, including NCI, are located in the District of Columbia, as are the investigative files.  Investigator Decl. at ¶ 12.  The formal order of investigation, the Subpoena and related correspondence emanated from, and were returnable to, Commission headquarters in the District of Columbia.  *Id*. at ¶¶ 14-15 and 17.  "Because . . . the Commission conducted the administrative activities essential to the investigation in the District of Columbia, the district court here ha[s] subject matter jurisdiction" under the Act.  *ASAT*, 411 F.3d at 249 (citations omitted).

Moreover, the subject matter of the investigation is necessarily nationwide in scope as it involves individuals who invested with Mr. Butler and NCI located throughout the United States.  Investigator Decl. ¶¶ 7-9 and 12-13 (noting that Division staff have received complaints and documents in its headquarters from individuals who invested with Mr. Butler and NCI and who reside in, among other places, Georgia, Florida, Oklahoma, Louisiana and New York).  Likewise, the investigation is necessarily nationwide in scope as it involves monetary transfers across state lines.  *Id*. at ¶ 15 (noting that between Mr. Butler's accounts at TD bank and First Southern there were deposits in excess of $430,000 and such deposits were made by various individuals across the United States, including but not limited to Alabama, South Carolina, and Florida over the period of September 2014 to March 2018).  Also, from its headquarters, Division staff have issued subpoenas, which are returnable to Washington, D.C., to banks with pertinent information located in Alabama, Utah, and New Jersey.  *Id*.  Further, from its

headquarters, Division staff have interviewed investors located in Florida and New York.  *Id.* at ¶ 16.

 *Cooper Tire*—which appears to be the sole instance of a District of Columbia court denying jurisdiction to an agency subpoena enforcement action—is readily distinguishable from the instant matter.  In that case, unlike here, the NLRB's inquiry focused on the localized labor-related activities occurring at a single manufacturing plant in Tupelo, Mississippi.  *Cooper Tire & Rubber Co.*, 438 F.3d at 1198-99.  Moreover, that case stemmed from alleged violations of an existing cease-and-desist order previously issued by a court in another jurisdiction, namely the Fifth Circuit.  *Id.* at 1202.  Facing these facts, the court found that the NLRB's mandate was no broader than the particularized events at issue.  *Id.* at 1204.  By contrast, the CFTC's mandate is to protect the integrity of global commodities futures, options, and derivatives markets.  COMMODITY FUTURES TRADING COMMISSION, *https://www.cftc.gov/About/ MissionResponsibilities /index.htm* (last visited October 3, 2018).  Any activity in these markets, including Mr. Butler's apparent fraudulent activity, necessarily affects market participants, like the investors described here, located across the United States.  "As such, given the broad nature of the [CFTC's] concern in this case, this would appear to qualify as a nationwide inquiry within the meaning of" the relevant precedents.  *La Rouche*, 613 F.2d at 856 (quoting *United States v. Firestone Tire & Rubber Co.*, 455 F. Supp. 1072 at 1077 (D.D.C. 1978)).

 Further, the Commission is aware of no case decided in the twelve years since *Cooper Tire* that followed its holding to deny jurisdiction in the District of Columbia to an agency seeking enforcement of a subpoena; rather, courts continue to enforce such subpoenas even after *Cooper Tire*.  *See, e.g.*, *Commodity Futures Trading Comm'n v. Ekasala*, 62 F. Supp. 3d 88, 92 (D.D.C. 2014) (enforcing a CFTC subpoena issued to a Florida-based owner of a Florida

company); *CFTC v. McGraw Hill Cos., Inc.*, 507 F. Supp. 2d 45 (D.D.C. 2007) (enforcing, in

part, a CFTC subpoena issued to a New York-based corporation); Ex 2, *Sullivan,* No. 15-mc-

00032, Dkt. No. 8, at 2 (enforcing a CFTC subpoena issued to a California-based owner and

California company); Ex. 3, *Conley,* No. 16-mc-02158, Dkt. No. 9, at 4 (enforcing a CFTC

subpoena issued to a Florida-based resident); [9] *see also F.T.C. v. Church & Dwight Co.*, 747 F.

Supp. 2d 3 (D.D.C. 2010) (enforcing administrative subpoena against Canadian

subsidiary), aff'd, 665 F.3d 1312 (D.C. Cir. 2011);  *FTC v. Boehringer Ingelheim Pharm., Inc.*,

898 F. Supp. 2d 171 (D.D.C. 2012) (petition for enforcement of administrative subpoena *duces*

*tecum* issued to aid investigation of alleged unfair trade practices by drug manufacturer and its

competitor granted); *United States v. Inst. for College Access & Success*, 27 F. Supp. 3d 106

(D.D.C. 2014) (petition to enforce administrative subpoena granted); *United States v. ISS Marine*

*Servs., Inc.*, 905 F. Supp. 2d 121 (D.D.C. 2012) (petition to enforce administrative subpoena

granted); *Anomnachi v. Social Security Admin., Office of Inspector Gen.*, 290 F. Supp. 3d 30

(D.D.C. 2017) (motion to quash administrative subpoena issued by Social Security

Administration's Office of the Inspector General as part of fraud investigation of bank account

denied); and *Nicksolat v. U.S. Dept. of Transp.*, 227 F. Supp. 3d 122 (D.D.C. 2017) (motion to

quash administrative subpoena denied).  This is not surprising as "administrative activities

[pertaining to agency subpoenas] may occur in the District of Columbia in most, if not all,

---

[9]   The facts in *Conley* are quite similar to the ones here.  There the Court noted that the District
of Columbia was the "hub" of the Commission's nationwide investigation because, among other
things: (1) the investigation was put into motion after the Commission received complaints from
persons in locales all across the United States; (2) the Commission had telephonically spoken to
potential witnesses in various states; (3) the Commission had issued subpoenas to person in
various states; and (4) the Commission uncovered that there were interstate bank transactions.
*Id.* at 5-6.

Commission inquiries and therefore the district court for the District of Columbia often, if not always, would have subject matter jurisdiction." *ASAT*, 411 F.3d at 250.

For these reasons, the District of Columbia is "the jurisdiction in which the investigation . . . is conducted," 7 U.S.C. § 9(8), and this Court has jurisdiction over the instant action.

### C.   The Commission Reasonably Chose to File Its Application in the District of Columbia

In light of the Commission's location, headquartered in the District of Columbia, and the necessarily nationwide scope of its investigations, the Commission's choice of this jurisdiction as the place of its inquiry and for the enforcement of its Subpoena was well within "the bound of reasonableness" as required by the second *La Rouche* prong.  *La Rouche*, 613 F.2d at 857.  *La Rouche* made clear that "the bound of reasonableness is broad indeed" and "an agency should be given *substantial* leeway in selecting its place of inquiry for subpoena enforcement purposes."[10]  *Id.* at 855 (emphasis added).  Here, as the Subpoena issued to Mr. Butler was issued from and made returnable to the Commission's headquarters in Washington, D.C., Mr. Butler could reasonably believe that he would be subject to the jurisdiction of the federal court in the District of Columbia.  Further, as Mr. Butler has not and indeed cannot "demonstrate [] actual hardship of defending [him]self in the District of Columbia, . . . it is not difficult to conclude that the Commission's choice of the District of Columbia to enforce the subpoena is well-within the 'bound of reasonableness.'"  *ASAT*, 411 F.3d at 250 (quoting *La*

---

[10]  This is especially the case as the Commission has no regional office in Alabama.  *See* Ex. 3, *Conley,* No. 16-mc-02158, Dkt. No. 9, at 6 ("Given that the Commission is conducting an essentially nationwide investigation from its national office in the District of Columbia it is afforded broad discretion in selecting this jurisdiction as its place of inquiry, and thus it cannot be said that the Commission exceeded the bound of reasonableness in bringing this enforcement action in the District of Columbia.  That is especially the case because the Commission is headquartered in the District of Columbia and has no regional office in Florida [where respondent resides]." (citations omitted)).

*Rouche*, 613 F.2d at 857); *see also Ekasala*, 62 F. Supp. 3d at 96 (finding no hardship in

enforcing a subpoena against a Florida-based respondent in the District of Columbia).

## II.     THIS COURT HAS PERSONAL JURISDICTION OVER RESPONDENT

In providing that "the Commission may invoke the aid of any court of the United States

within the jurisdiction in which the investigation or proceeding is conducted," 7 U.S.C. § 9(8)

"establishes where . . . personal jurisdiction [is] proper."  *See* Ex. 2, *Sullivan,* No. 15-mc-00032,

Dkt. No. 8, at 2; Fed. R. Civ. P. 4(k)(1)(C) ("Serving a summons or filing a waiver of service

establishes personal jurisdiction over a defendant when authorized by federal statute."); *see also*

*ASAT*, 411 F.3d at 252 (interpreting similar statutory language to provide nationwide service of

process and thus personal jurisdiction); *La Rouche*, 613 F.2d at 860 ("It is inconceivable to us

that Congress would have vested the Commission with such broad powers of compulsory

process, while intending that they not have extraterritorial effect."); Ex. 3, *Conley,* No. 16-mc-

02158, Dkt. No. 9, at 7 ("Personal jurisdiction is also proper in this District.  The statutory

language permitting courts 'within the jurisdiction in which the investigation . . . is conducted' to

order compliance with the Commission's subpoena, 7 U.S.C. § 9(8), 'must be interpreted as a

special grant of jurisdiction" and thus authorizes the court "in the district wherein the action is

required to be brought to obtain jurisdiction of the person [ ] of the defendant [ ] through service

upon [him] of its process in whatever district [he] may be found.'" (quoting *Browning*, 435 F.2d

at 99))  Because the Commission properly served the Subpoena in connection with its

investigation being conducted in the District of Columbia, this Court has personal jurisdiction

over Respondent to enforce the Subpoena.

## III.     VENUE IN THIS COURT IS PROPER

7 U.S.C. § 9(8) likewise provides for venue in this District.  Although questions of

subject matter jurisdiction and proper venue are typically distinct, under the controlling statutory

language "the two inquiries merge." *ASAT*, 411 F.3d at 248.  For the same reasons that it was within the "bounds of reasonableness" to initiate this action in the District of Columbia, so too venue is proper here.  *Id.* ("Because the second [*LaRouche*] criterion resembles a traditional venue analysis that focuses on the convenience of the forum to the parties, . . . [it] implicates whether that court is a proper venue." (citations omitted)).

## THE COURT SHOULD GRANT THIS APPLICATION AND ISSUE AN ORDER FOR RESPONDENT TO SHOW CAUSE

Administrative agencies like the Commission "wield broad power to gather information through the issuance of subpoenas," *Resolution Trust Corp. v. Grant Thornton*, 41 F.3d 1539, 1544 (D.C. Cir. 1994), and "[a]n administrative subpoena must be enforced if the information sought 'is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant.'" *Resolution Trust Corp. v. Walde*, 18 F.3d 943, 946 (D.C. Cir. 1994) (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950)); *accord Resolution Trust Corp. v. Frates*, 61 F.3d 962, 964 (D.C. Cir. 1995); *CFTC v. Ekasala*, 62 F. Supp. 3d 88, 93 (D.D.C. 2014); *United States v. Capitol Supply, Inc.*, 27 F. Supp. 3d 91, 99 (D.D.C. 2014).  Here, the Commission's investigation is within its jurisdiction, and its administrative process and the Subpoena complies with this Circuit's standard for enforcement.

## I.    THE SUBPOENA IS WITHIN THE COMMISSION'S BROAD INVESTIGATIVE AUTHORITY

The Commission, like other federal agencies, has far-reaching investigatory authority permitting it to "investigate merely on suspicion that the law is being violated, or even just because [the agency] wants assurance that it is not." *Morton Salt*, 338 U.S. at 642–43; *see also Walde*, 18 F.3d at 947 (following *Morton Salt*).  The Commission's authority is especially broad at the pre-complaint stage, where it "is under no obligation to propound a narrowly focused

theory of a possible future case." *Ekasala*, 62 F. Supp. 3d at 93 (quoting *Federal Trade Comm. v. Texaco*, 555 F.2d 862, 872 (D.C. Cir. 1977)).

An essential component of this investigatory power is the Commission's ability to issue and serve subpoenas. *See* 7 U.S.C. § 12(a)(1) ("For the efficient execution of the provisions of this Act . . . the Commission may make such investigations as it deems necessary to ascertain the facts regarding the operations . . . [of] persons subject to the provisions of this Act.") *and* 7 U.S.C. § 9(5) ("[A]ny . . . officer designated by the Commission . . . may . . . subpoena witnesses, compel their attendance, take evidence, and require the production of any . . . records that the Commission deems relevant or material to the inquiry"); *see also CFTC v. Harker*, 615 F. Supp. 420, 424 (D.D.C. 1985) ("[T]he Act grants the Commission the authority to subpoena witnesses and to seek judicial enforcement of such subpoenas." (citing 7 U.S.C. § [9])).

Having followed proper administrative procedure, "[t]he CFTC must be given substantial leeway to investigate" so that it may assess whether parties have "complied with or run afoul of the [Act] or CFTC Regulations," *Collins v. CFTC*, 737 F. Supp. 1467, 1485 (N.D. Ill. 1990), and "enforcement of [its] investigatory subpoena will be denied only when there is 'a patent lack of jurisdiction' in an agency to regulate or to investigate." *Federal Trade Comm. v. Ken Roberts Co.*, 276 F.3d 583, 587 (D.C. Cir. 2001), *cert. denied*, 537 U.S. 820 (2002) (*quoting Civil Aeronautics Bd. v. Deutsche Lufthansa Aktiengesellschaft*, 591 F.2d 951, 952 (D.C. Cir. 1979)); *see also Texaco*, 555 F.2d at 872 ("[T]he scope of issues which may be litigated in an enforcement proceeding must be narrow, because of the important government interest in the expeditious investigation of possible unlawful activity."); *Capitol Supply*, 27 F. Supp. 3d at 99 (citing *Texaco*).

The Subpoena to Mr. Butler—properly issued pursuant to a formal order of investigation—plainly falls within the scope of the Commission's authority to investigate potential violations of the Act and Regulations. *See* 7 U.S.C. §§ 9, 12(a)(1) (2012). The Subpoena seeks documents and information relating to a potential fraudulent scheme involving a pooled or managed investment vehicle that solicits for the purported purpose of trading commodity option products, namely the management of accounts trading binary commodity options in forex on behalf of customers located in the United States. This type of conduct falls squarely within the Commission's regulatory authority. *See, e.g.*, 7 U.S.C. § 6b (2012); 17 C.F.R. § 180.1 (2016); *see also CFTC v. Trade Exchange Network Ltd.*, 117 F.Supp.3d 29, 35–38 (D.D.C. 2015) (holding that binary options in commodities such as forex are financial instruments regulated by the Commission under the Act); *CFTC v. Vision Financial Partners*, 190 F.Supp.3d 1126, 1130 (S.D. Fla. 2016) (same). Documents and testimony responsive to the Subpoena would assist the Commission with determining whether there are or have been violations of these provisions.

## II.   THE SUBPOENA SEEKS SPECIFIC, RELEVANT INFORMATION

The standard for determining the relevance of records and testimony requested by an administrative subpoena "'is more relaxed than in an adjudicatory one . . . . The requested material, therefore, need only be relevant to the investigation—the boundary of which may be defined quite generally . . . .'" *Walde*, 18 F.3d at 947 (*quoting Federal Trade Comm. v. Invention Submission Corp.*, 965 F.2d 1086, 1090 (D.C. Cir. 1992), *cert. denied*, 507 U.S. 910 (1993)); *accord Ekasala*, 62 F. Supp. 3d at 93. In making a relevancy determination, a court must accept a federal "agency's own appraisal of relevancy . . . so long as it is not 'obviously wrong.'" *Invention Submission*, 965 F.2d at 1089 (quoting *Federal Trade Comm. v. Carter*, 636 F.2d 781, 787–88 (D.C. Cir. 1980)); *accord Ekasala*, 62 F. Supp. 3d at 93. In the event of a

challenge to a subpoena, "the party resisting an administrative subpoena bears the burden of showing that the information sought is irrelevant." *Frates*, 61 F.3d at 964.

Here, Mr. Butler has provided no basis for his refusal to comply with the Subpoena. Further, he has not contested that he has no relevant documents or information. In any event, a belated claim of irrelevancy would certainly fail. The Subpoena seeks information that is clearly relevant to the Commission's investigation into potential fraud in pooled or managed commodity accounts by Mr. Butler and the Aaron Butler Companies, including NCI. Thus, for example, documents concerning the Mr. Butler's trading accounts, statements, or practices, Investigator Decl. at ¶ 18 and Ex. A thereto at 9–11 (Demand Nos. 1-4), will allow the Commission to assess the scope and nature of relevant trading involved. Documents evidencing a complete list of Mr. Butler's customers will aid the Commision in identifying the full scope of his business as well as aid the Commission in developing an approximate amount of money that was collected and returned to customers. *Id.* (Demand No. 19). Documents concerning Mr. Butler's communications with customers and prospective customers of the Aaron Butler Companies, including NCI, *id.* (Demand Nos. 6-8), will provide leads as to who else invested with Mr. Butler and those companies. Similarly, documents concerning Mr. Butler's bank accounts, *id.* (Demand Nos. 11-12), will shed  light on not only who may have provided funds for investment to Mr. Butler but also whether Mr. Butler misappropriated customer funds. Further, testimony from Mr. Butler on these and other related topics will be instrumental to the Commission's understanding of the nature, scope, and extent of the relevant activities, and to further aid in its investigation. Measured, as they must be, "'only against the general purposes of [the] investigation,'" such requests and demand for testimony indisputably are "reasonably" relevant to the Commission's investigation. *Ekasala*, 62 F. Supp. 3d at 93 (quoting *Texaco*, 555 F.2d at

874) (finding requests for "corporate formation documents, promotional materials, information regarding former officers and employees, and bank account statements" to "plausibly contain information relevant to the investigation").

Finally, the Subpoena is narrowly focused, limited in time, and imposes minimal burdens on Mr. Butler.  The Subpoena provides dates, definitions, instructions and twenty specific requests for documents, limited to the period of January 1, 2013 through the present. Investigator Decl. at ¶ 18 and Ex. A thereto.  Such requests are reasonable and should be enforced.  *See Ekasala*, 62 F. Supp. 3d at 93 (enforcing a subpoena with similarly definite requests); *see also Texaco*, 555 F.2d at 882 ("We emphasize that the question is whether the demand is unduly burdensome or unreasonably broad.  Some burden on subpoenaed parties is to be expected and is necessary in furtherance of the agency's legitimate inquiry and the public interest.").  To the extent Mr. Butler attempts for the first time in response to this application to argue burden, this Court should deny such argument on the grounds that he "has not been responsive or particularly communicative with the CFTC regarding compliance . . . [and] he never made an attempt to comply with them in the first instance."  *See Ekasala*, 62 F. Supp. 3d at 95.

## **CONCLUSION**

The Court has subject matter jurisdiction over the instant action and personal jurisdiction over Mr. Butler, and venue in this Court is proper.  Further, the Subpoena, and the documents and information that it seeks, are well within the Commission's authority, and they are sufficiently definite and seek reasonably relevant information.  Therefore, the Court should issue an order requiring Mr. Butler to show cause why he should not be compelled to comply fully with the Subpoena.  Further, should Mr. Butler not show good cause, then the Court should issue a subsequent order: (1) requiring Mr. Butler to comply immediately in all respects with the

Subpoena, including (a) that he produce all books, papers, documents and other tangible things

specified in Schedule A to the Subpoena to the Commission that are in his possession, custody

and/or control, and (b) that he personally appear before the Commission at its office in

Washington, D.C., to provide testimony; and (2) providing any other relief the Court deems

appropriate for Mr. Butler's failure to show good cause.


Dated:  October 10, 2018                         Respectfully submitted,


                                                 */s/ James W. Deacon*
                                                 James W. Deacon (DC Bar No. 476216)
                                                 *jdeacon@cftc.gov*
                                                 U.S. COMMODITY FUTURES TRADING COMMISSION
                                                 Three Lafayette Centre
                                                 1155 21st Street NW
                                                 Washington, D.C. 20581
                                                 Tel:  (202) 418-5526